STATE OF MAINE                                    SUPERIOR COURT
AROOSTOOK, ss                                     DOCKET NO. CARSC-RE-2018-53


PENELOPE MCHATTEN              )
                   Plaintiff   )
                               )
                               )
And                            )
                               )
                               )
                               )
KENNETH B. HAFFORD and         )
SUSAN P. HAFFORD               )     DECISION RE: DECLARATORY JUDGMENTS
                   Plaintiffs  )     AND QUESTIONS OF LIABILITY
                               )
                               )
Vs                             )
                               )
                               )
PAUL F. BALLERSTEIN and        )
GOLDIE E. BALLERSTEIN          )
                   Defendants  )


        This matter came on for hearing before the undersigned Active Retired Justice of the

Superior Court sitting in the Presque Isle District Court on October 28 and 29, 2019. At that time

all three Plaintiffs appeared with counsel. Both of the Defendants also appeared and continued

to represent themselves as they had done throughout the course of the proceedings. The court has

now had an opportunity to consider the evidence presented[1] as well as the written post-hearing

arguments submitted by each party and issues the following decision[2].

---

[1] At the outset of the proceedings, the parties consented to the court taking judicial notice of the entire contents of the file and accordingly, the evidence considered also has included the file contents.
[2] Because the initial estimates of the time required to present this case exceeded the available trial court time, the court and the Ballersteins agreed to the Plaintiffs' proposal that the trial be bifurcated. Accordingly, during the first phase of the trial, the court received evidence only with respect to the questions of the locations of the two boundaries in dispute and with respect to questions of legal liability on the various civil claims presented by the parties. Any questions of damages were deferred to a subsequent proceeding if required.

1

BACKGROUND

The parties own adjoining residential properties located on a curved portion of Dupont Drive in Presque Isle, Maine. The Plaintiff McHatten's (McHatten) property and the Plaintiff Haffords' (Hafford) properties are located on either side of the Defendant Ballersteins' (Ballerstein) property which lies between the respective properties of McHatten and Hafford.

McHatten acquired her property on or about August 24, 2000[3]. Her property lies generally to the west of the Ballerstein property. McHatten's easterly boundary therefore abuts Ballersteins' westerly boundary. The location of this boundary is disputed. The Haffords acquired their property on or about June 18, 1974.[4] Their property lies generally to the south of the Ballerstein's property. The Haffords' northerly boundary therefore abuts the Ballersteins' southerly boundary.[5] The location of this boundary is also disputed. The Ballersteins acquired their property on or about July 24, 2017.[6]

The core issues in this litigation pertain to the location of McHatten's easterly boundary and the location of the Haffords' northerly boundary. The locations of these two boundaries are the central foci of the Plaintiffs' complaint seeking a declaratory judgment.

McHatten and the Haffords had lived harmoniously alongside their common neighbors for many years, completely unaware of the long dormant technical conflicts that lay within the respective deeds of the parties. Shortly after the Ballersteins acquired their property, personal relationships began to chafe. When Mr. Ballerstein cut down the chain link fence without

---

[3] See Plaintiffs' Exh.1
[4] See Plaintiffs' Exh. 2
[5] Because the properties lie generally at a turn in Dupont Drive, the relevant general compass directions referred to herein are potentially a little confusing.
[6] See Plaintiffs' Exh. 3

warning to McHatten and began to break up the concrete footer, it became apparent that the parties disputed their common boundary lines and the seeds of this litigation were sown.

As per paragraph 2 of the Ballerstein answer to the complaint, in August of 2017, just a few weeks after acquiring title to their property and in order to resolve their own questions regarding the location of their boundaries the Ballersteins hired a surveyor. [7]

McHatten and the Haffords commenced this litigation on or about September 17, 2018 by serving a complaint upon the Defendants. The Defendants filed an answer and counterclaim on or about October 3, 2018. The Plaintiffs replied to the counterclaim on or about October 19, 2018. The court issued its standard scheduling Order on November 9, 2018. Among other things[8], that Order required that expert witnesses be designated by specific dates. The Plaintiffs have been represented by counsel throughout the course of proceedings. The Defendants have represented themselves throughout the course of proceedings.

The court has made its relevant factual findings regarding the parties' various actions and interactions and has articulated its conclusions and judgments herein.[9]

### THE COMPLAINT AND COUNTERCLAIMS

---

[7] Although the Ballersteins hired Mr. William Gerrish, a Maine licensed professional surveyor and a Maine licensed professional engineer, to determine the boundaries of their property in August of 2017, they failed to designate him as an expert witness as required by this court's pretrial order dated November 9, 2018. In response to the Plaintiffs' *Motion in Limine*, the court issued its Order dated October 18, 2019 barring the Defendants from presenting any expert witness, including Mr. Gerrish. Consequently, the court has not considered the survey that he prepared or any opinions or conclusions that he might have drawn. That same Order ruled that the Defendants had failed to raise any defenses pursuant to M.R.Civ.P. 12(b) and M.R.Civ. P. 8(c) including but not limited to "accord and satisfaction". The court notes that on at least two occasions (December 27, 2018 and August 7, 2019) when it met with the parties, it cautioned the Defendants, who are educated professional people but who have no formal legal training as far as this court is aware, that court proceedings can be quite complex and that they might want to consider employing counsel because Maine has but one set of court rules, irrespective of whether a party is represented or not. This is a long-standing principle most recently articulated in Fox v. Fox, 2019 ME 163 (Decided December 10, 2019)

[8] The Order also sets forth deadlines for the completion of discovery. From the court's review of the file and from its general observation of the course of this litigation, it is apparent that neither party undertook any pretrial discovery at all.

[9] The court has not attempted to address every factual dispute that the parties have raised during the course of this litigation but rather has addressed only specific factual determinations and conclusions that are relevant to specific claims.

3

The complaint in this case presents the joint claims of McHatten and the Haffords against the Ballersteins or the Ballerstein property interests. McHatten and the Haffords occupy different properties however and therefore the boundaries in dispute are different. Similarly, the individual actions of each Plaintiff vis a vis the Ballersteins are not the same, nor were the Ballersteins actions vis a vis each Plaintiff the same. Accordingly, the court will endeavor to address the specific claims of each individual plaintiff separately and to address each of the specific counterclaims of the Ballersteins separately.

The Plaintiffs' complaint sets forth the following claims:

Count 1: Each plaintiff seeks a declaratory judgment regarding the common boundary shared with the Ballersteins.

Count 2: Each plaintiff contends they have established title to disputed land according to the principles of the doctrine of adverse possession.

Count 3: Each plaintiff contends they have established title to disputed land according to principles of the doctrine of title by acquiescence.

Count 4: Each plaintiff claimed damages for common law trespass.

Count 5: Each plaintiff has claimed damages pursuant to statutory trespass as provided for within 14 M.R.S. § 7551-B.

Count 6: Each plaintiff has claimed damages pursuant to statutory trespass as provided for within 14 M.R.S. § 7552.

Count 7: Each plaintiff has claimed damages for conversion.

Count 8. Each plaintiff has claimed damages for the intentional infliction of mental distress.

Count 9: Each plaintiff has claimed damages for the negligent infliction of mental distress.

The Ballersteins have filed a two-count counterclaim jointly claiming against each plaintiff the following:

4

Count 1: The Ballersteins claim that each plaintiff has "defamed the character" of Paul Ballerstein and that he is entitled to damages and punitive damages.

Count 2: The Ballersteins claim that each plaintiff has intentionally inflicted emotional distress upon each of the Ballersteins.

The Plaintiffs have also filed a motion for Injunctive Relief that remains pending.[10]

## I. THE MCHATTEN CLAIMS.

Count 1: Declaratory judgment

At the outset, the court notes that in an action seeking a declaratory judgment the proponent of an affirmative conclusion has the burden of proving that conclusion by a preponderance of the evidence. Hodgdon v. Campbell, 411 A.2d 667, 670 ( Me. 1980) It is well established that proving something by a preponderance of the evidence means proving that the proposition is more likely true than not true. (See generally, *Alexander, Maine Jury Instruction Manual*, §7-11(2017)) Expressed slightly differently, proving something by a preponderance of the evidence means proving it by the greater weight of the evidence. Expressed as a mathematical proposition, proving something by a preponderance of the evidence means proving it to a mathematical percentage of at least fifty one percent (51%). Therefore, in cases involving a boundary dispute, the proponent of the location of a boundary has the burden of proving that their claimed boundary location is, more likely than not, the boundary.

Additionally, it should be understood that when a court makes factual determinations, it may do so on the basis of direct evidence, that is, evidence that a witness may present that is based on direct personal knowledge acquired through the utilization of their own faculties. If one

---

[10] The court met with the parties on December 27, 2018 for a Pre-Trial Management conference and among other things secured the parties consent to maintain the "status quo" regarding their respective boundaries pending completion of the litigation. Accordingly, the court deferred addressing the request for a preliminary injunction until a determination of the merits of the underlying action could be achieved.

5

sees, hears, tastes, touches, or smells something and then relates those perceptions through their testimony, courts regard this as direct evidence.

On the other hand, courts may also make factual determinations on the basis of circumstantial evidence. When a court relies upon circumstantial evidence, it is essentially examining evidence of a particular circumstance and then applying its common sense and life experience to draw particular factual conclusions from that circumstance.

Accordingly, it should be understood that a court may determine facts upon the basis of direct evidence and also upon the basis of inferences of fact drawn from an examination of relevant circumstances. The law does not regard one kind of evidence as being of greater or lesser weight than the other form of evidence. (See generally, *Alexander, Maine Jury Instruction Manual* §6-9 (2017))

At the outset, the court would note that the McHatten deed, the Hafford deed and the Ballerstein deed all lack some degree of "mathematical" precision in the calls that define the property being conveyed. That is, at least part of the description of each parcel includes at least one call for a "more or less" distance. Potentially, this could result in a determination that the distance under consideration could be somewhat longer or somewhat shorter than the numerical value of the distances as expressed in such a deed.

As a result, each deed reflects no more than an approximate description of its boundaries. In the McHatten deed, this approximation is contained within the description of the third piece making up the McHatten parcel. This piece lies towards the north part of the McHatten lot and is not directly implicated in locating the McHatten easterly boundary. Nonetheless it results in an overall approximate description of the McHatten parcel.

Similarly, three of the four calls in the Hafford deed are also "more or less" distances; once again resulting in an approximate location of the parcel on the face of the earth. Similarly, three of the four calls in the Ballerstein deed are "more or less" distances and also produce an approximate location of this parcel on the face of the earth. When these descriptions are each laid out, overlapping boundaries emerge.

It is well established in Maine law that determining what the boundaries of a parcel of land are is a question of law. Where the boundaries are located on the face of the earth is a question of fact. *Hodgdon* p. 672.

The Plaintiffs called Timothy Roix in support of their contention regarding the location of the common boundary between the McHatten and Ballerstein properties. Mr. Roix is both a Licensed Professional Land Surveyor and a Licensed Professional Engineer (Civil). In addition to his formal education and training, he has over thirty-five (35) years of experience in the surveying and civil engineering fields. Although this court has had no prior contact with Mr. Roix, after listening to his description of his training, education and experience the court would conclude that he is a well-qualified expert witness and competent to address the issues regarding the locations of the disputed boundaries in this case. The court would also find that Mr. Roix was an objective and unbiased witness and accepts his testimony in its entirety.[11]

Mr. Roix was the only expert witness called to testify.[12] He described how it was that he became involved in this case, the scope of his engagement and the work that he did. Mr. Roix

---

[11] Although, the Defendants sought to portray Mr. Roix as biased in favor of Ms. McHatten, the court rejects this suggestion. While it is true that Mr. Roix has had prior professional contact with Ms. McHatten when she was employed in the banking industry, it would be this court's observation based on over forty year of experience that the group of "real estate transactional professionals" in Aroostook County to include lawyers, bankers and land surveyors is a very small one and consequently, just about every professional has worked with just about every other professional at one time or another and on more than one occasion. It should not be surprising that many are on a "first name basis." This familiarity does not equal bias.

[12] Although the Defendants had engaged a surveyor to opine regarding the location of boundaries, they were foreclosed from calling that person as an expert witness because they failed to comply with the court's scheduling

extensively researched all of the relevant deeds, including the source deeds, involved in this dispute. He went out into the field on two occasions and located multiple relevant monuments. He reviewed subdivision plans and surveys that other professionals had prepared over the years. He analyzed his findings which reflected multiple inconsistencies and which produced conflicting and overlapping boundaries when plotted on paper. His objective was to reconcile the conflicting boundaries with the particular deed descriptions, the evidence he found in the field and other relevant information to determine the most likely intent of the grantors of the conveyances involved.

Mr. Roix opined that in order to determine the intent of the various parties, and to locate the boundaries in dispute it was important to look at the "overall picture" not only as portrayed by the words in the deeds, but also by the evidence that he found in the field. He testified that when a surveyor reads a description of "more or less" in a deed, it is most probably an indication that the parcel was not professionally surveyed. This statement rings true for the court. Consequently, the descriptions in the three deeds involved in this case are, at least in part, only approximations of the locations of the property they purport to describe.

The Defendants point out that their deed is a "senior deed". This is not disputed and Mr. Roix acknowledged that he was familiar with the concept of "senior rights" vs. "junior rights." He cautioned however that while "senior rights" are an important factor to be considered, they do not necessarily control because they do not indicate the size, shape or location of the parcel being examined. Mr. Roix opined that the size shape and location of a parcel can only be determined by an examination of all of the conveyances that may be implicated as well as the results of the field work. He indicated that the history of land conveyancing within the area can also provide

order obligating them to identify any expert witness they intended to call at trial and obligating them to supply the required M.R.Civ.P 26 (b)(4)(A)(i) information during the discovery period.

important clues as can an examination of other available survey plans of land within the same area, irrespective of whether they are referenced in the subject deeds.

Of particular importance to the Ballersteins are the second and third calls of their deed. The second call, "Thence westerly at right angles to said east line one hundred twenty-five (125) feet;" would extend their property towards the disputed boundary line with McHatten. The third call, "Thence northerly, parallel to said east line of said lot, two hundred thirteen (213) feet, more or less, to the southerly line of said parcel conveyed by said Fernand to said Dingwall;" would produce a common boundary with McHatten that would result in the chain link fence and concrete footer discussed herein falling within their property. This is certainly one possible solution. However, it is not the solution that Mr. Roix found to be the most reliable solution and the best supported solution in looking at the entirety of the circumstances.

The Defendants point to the words "right angles" and "parallel" in support of their contention regarding the location of their boundary. As the court has considered this matter, it has occurred to it that there are few absolutes in the law, or in life, and exceptions abound. Sometimes words can have multiple meanings. The court agrees with Mr. Roix that the descriptions in deeds that include the words "more or less" are often prepared by lawyers or others without benefit of an actual survey. Consequently, those deed descriptions prepared without benefit of an actual survey may not always be as precisely accurate as one would hope, notwithstanding the precision or exactness of the language used. The Defendants cite Snyder v. Haagen, 679 A.2d 510, 513 (Me. 1996) in support of their argument that "a right angle means a ninety-degree angle." The *Snyder* case cites Hodgdon v. Campbell, 411 A.2d 667, 672 (Me. 1980) for its support of this proposition. However, the court notes that *Hodgdon* left undisturbed, a referee's conclusion that a call of "thence northerly *parallel* with said wall to a

9

bolt in a rock on the southerly side of said road" did not actually mean parallel in a geometric sense but only parallel as "with like direction or tendency." In support of its *Hodgdon* determination, the Law Court cited Universal Home Builders, Inc. v Farmer, 375 S.W. 2d 737, 743 (Tex. Civ. App. 1964) wherein the following language appears,

> "From these facts and circumstances, it appears that by use of the language "and parallel with the S line of said J.F. Nelson 5-acre tract" the parties did not intend a course that was geometrically and mathematically equidistance at every point with the south line of the Nelson tract, but rather intended the language to convey a meaning of "with like direction or tendency" or "running side by side." The word "parallel" has been so defined. The language simply denoted lines which were not straight, as stated in [citation for a California case omitted].

> By definition, parallel lines are undoubtedly straight lines; but in common speech about boundaries or in a geographical sense, the words, as we all know, are often used to represent lines which are not straight, but are the photographs of each other. The term is used for want of a better, and not because it in all respects fits the use to which it is applied. It is so used to avoid circumlocution, and while such use is not technically exact, it is not obscure, and there is no difficulty in understanding what is meant. Nothing is more common than to speak of boundaries which are not straight as parallel." (Internal citations omitted.)

The court notes that the second call in the Ballerstein deed is the only call for a right angle (and a distance of 125"[13]). In this court's view, it is not this call for a "right angle" that is problematic. What is problematic is the third call that speaks of a "parallel" line. The third call directs, "Thence northerly, *parallel* to said east line of said lot, two hundred thirteen (213) feet, more or less, to the southerly line of said parcel conveyed by said Fernand to said Dingwall." The same *Hodgdon* case that supports the Defendants' contentions regarding the meaning of "right angles" also supports a conclusion that "parallel" might not be a geometric term but only a "tendency." This is essentially Mr. Roix's conclusion. It is also a finding of the court.

---

[13] Although the words "more or less" are not included within the call for a "distance of 125", Mr. Roix feels that this may also have been an approximate distance. This possibility is supported by Plaintiffs' Exh. 12 wherein Mr. Holmes reported that distance to be "125' +/-"

10

Among the evidence that Mr. Roix considered in reaching his conclusion was a survey done by J.F. Hoyt in January of 1970. (See Plaintiff's Exh. 14). The survey was done for Thomas Lavin Jr., whose deed the court believes to be in the Ballerstein chain of title. That survey reflects that there were iron pins at all four corners of the lot. For reasons that remain unknown, Mr. Roix's field efforts produced only one iron pin that is shown on Plaintiffs' Exh. 10A as the "Point of Beginning For Dingwall." The Ballerstein description that begins at this same point makes no reference to any "Existing iron pin". Mr. Hoyt's first call according to his survey is for a compass bearing of "S22 degrees-15 minutes West for a distance of 179.9 feet.[14]" The next call is for "One hundred and twenty-five feet (125) to an iron pin"; this is followed by the third call of "North 25 degrees-30 minutes East for a distance of two hundred and eight 208 feet to an iron pin". The first call and the third call are not geometrically parallel; they are off by more than three (3) degrees. Query how they became "parallel" in the Ballerstein deed, if not perhaps in accord with the notion of "tendency" to be parallel?

Mr. Roix also considered the 1976 Richard Holmes' survey (Plaintiff's Exh. 13) of the lots at the north end of Dupont Street. The survey includes all three of the lots in dispute in this litigation. The Ballerstein lot is referenced as the [Swett to Lavin] conveyance in 1969. A close inspection of that survey reflects conflicts between the distances called for in the deed with three out of the four calls shown in the survey. The court is aware that Mr. Holmes had prepared an earlier survey in 1959 (See Plaintiff's Exh. 12) that shows part of the Wiggin to Tompkins, Jr. lot (now the Ballerstein lot) and that the first distance shown appears to be "181' +/-(more or less)";

---

[14] Mr. Roix pointed out that as reflected in Plaintiffs' Exh. 13, surveyor Richard Holmes determined the length of the easterly bound of the Ballerstein lot to be 179.5' when the deed called for 186' more or less. He also acknowledged that the same distance appears in a 1959 survey by Mr. Holmes to be 181' more or less. He was unable to account for the conflict but pointed out that neither measurement was 186'.

11

the second distance is not at a right angle as it now is in the Ballerstein deed it is just a little less[15] and the second distance is not for 125' it is for 125' +/-(more or less).

Thus, Mr. Roix essentially concludes that the McHatten and Ballerstein boundary may not be the product of an exact ninety-degree angle or of an exactly parallel line in a geometric sense. In further support of his ultimate opinion that the boundary lies just a few feet to the east of such a line was the field work that he performed. Mr. Roix was able to locate a number of monuments that he felt served to define Lot 11 of the Aubrey Smith Addition, including one that he found within 3" of what would be the northeast corner of the McHatten lot.[16] It is clear from Mr. Roix that the Aubrey Smith Addition was created by a surveyor. Mr. Roix was able to locate many monuments that enabled him to determine the location of Lot 11 within that subdivision with a high level of confidence. This level of confidence, predicated upon monuments found in the field, contrasts with the "approximate" location of the Ballerstein parcel, defined in largest part by "more or less" calls. In Mr. Roix's opinion, substantial physical evidence supported his opinion regarding the location of the boundaries of Lot 11 as well as the forty-nine-point five (49.5) foot wide additional parcel and the eighteen (18) foot wide parcel to the north. Through his research and field work Mr. Roix found what the court understands to be the pin that marked the northerly terminus of the McHatten easterly bound. The court finds this persuasive and it accepts Mr. Roix's rationale and his conclusion[17].

---

[15] The angle shown in the northeast corner is "90 degrees 47 minutes". This would result in the southeast corner creating an angle of "89 degrees 13 minutes." The court also acknowledges that there are conflicts between Mr. Holmes' 1959 survey (P's Exh. 12) and his 1976 survey (P's Exh. 13). There is insufficient record evidence to enable the court to reconcile the two surveys or otherwise explain the conflicts and accordingly it is unable to do so. The court notes however that the "preponderance of the evidence" standard is considerably more tolerant of unresolved conflicts than is the criminal standard of "proof beyond a reasonable doubt."

[16] The McHatten lot is comprised of three distinct lots. The first is Lot 11 of the Aubrey Smith Addition; the second is a 49.5 foot wide parcel that abuts Lot 11; the third is an 18 foot wide parcel that extends across the top of the first two lots in a general east to west (west to east) direction. Mr. Roix found a monument at what he determined to be the northeast corner of the 18 foot strip (Evidence #126 on Plaintiff's physical evidence list.)

[17] Remembering that the governing standard is one of a *preponderance of the evidence*, the court acknowledges that there is plenty of room for disagreement and that different persons might logically come to different conclusions

12

Recognizing that the applicable standard of proof is not one of "beyond a reasonable doubt", but rather one of a "preponderance of the evidence" this court finds that more probably than not the boundary between the McHatten lot and the Ballerstein lot is as Mr. Roix has opined and highlighted in yellow on Plaintiff's Exh. 10A. This conclusion results in the chain link fence and concrete footer discussed herein lying within the McHatten lot.

> Count 2: Each plaintiff contends they have established title to disputed land according to the principles of adverse possession.

> Count 3: Each plaintiff contends they have established title to disputed land according to principles of the doctrine of title by acquiescence.

Having determined the location of the disputed McHatten boundary by its declaratory judgment decision, the court deems it unnecessary to address the claims set forth in Counts 2 and 3.

> Count 4: Each plaintiff claimed damages for common law trespass.

Because each plaintiff abandoned any claim for common law trespass at trial, the court does not address these claims any further.

> Count 5: Each plaintiff has claimed damages pursuant to statutory trespass as provided for within 14 M.R.S. § 7551-B[18].

---

based on the same evidence (See State v. Merrow, 161 Me 111 (1965)) and that in some instances, such evidence might actually support a contrary conclusion. (See Milligan v. Milligan, 624 A.2d 474, 478 (Me. 1993)). In this instance however, the court has chosen to accept the unrebutted opinion of the only expert witness who presented evidence in the case.

[18] § 7551-B. Trespass damages

1. Prohibition. A person who intentionally enters the land of another without permission and causes damage to property is liable to the owner in a civil action if the person:

> A. *Damages or throws down any fence,* bar or gate; leaves a gate open; breaks glass; damages any road, drainage ditch, culvert, bridge, sign or paint marking; or does other damage to any structure on property not that person's own; or

> B. Throws, drops, deposits, discards, dumps or otherwise disposes of litter, as defined in Title 17, section 2263, subsection 2, in any manner or amount, on property not that person's own.

13

In order to prevail on this statutory claim for trespass, McHatten must prove by a preponderance of the evidence, that:

1. She owned the land that was subjected to trespass;

2. That Mr. Ballerstein intentionally entered McHatten's land and damaged her property by damaging and/or taking down a fence;

3. That he did not have McHatten's permission for those actions.

The court has now determined that the chain link fence and concrete footer that lay between the Ballerstein and McHatten property was located on property that McHatten owned.

---

2. Liability. If the damage to the property is caused intentionally, the person is liable to the owner for 2 times the owner's actual damages plus any additional costs recoverable under subsection 3, paragraphs B and C. If the damage to the property is not caused intentionally, the person is liable to the owner for the owner's actual damages plus any additional costs recoverable under subsection 3, paragraphs B and C.

3. Damages recoverable. The owner's damages include:

A. Actual damages, as measured by subsection 4;

B. Costs the owner may incur if the damage results in a violation of any federal, state or local law or ordinance and, as a result, the owner becomes the subject of an enforcement proceeding. These costs include attorney's fees, costs and the value of the owner's time spent on involvement in the enforcement proceeding; and

C. Reasonable attorney's fees for preparing the claim and bringing the court action under this section plus costs.

4. Measure of damages. For damage to property under subsection 1, paragraph A, the owner's damages may be measured either by the replacement value of the damaged property or by the cost of repairing the damaged property. For damages for disposing of litter, the owner's damages include the direct costs associated with properly disposing of the litter, including obtaining permits, and the costs associated with any site remediation work undertaken as a result of the litter.

5. Other actions barred. A recovery from a defendant under this section bars an action to recover damages under section 7552 from that defendant for the same specific damage.

The evidence is undisputed that Mr. Ballerstein cut down McHatten's chain link fence and damaged its concrete footer. The statute requires that such trespass be committed "intentionally", that is that the trespasser intentionally entered the land of another. The concept of *intentional action* is another word in the legal lexicon that can have a meaning that is sometimes not fully understood.

In order to become liable for a trespass on land, all that is necessary is the intent to be on the particular part of the land; it is not necessary for the defendant to know that the land is owned by another. The court's understanding of this aspect of the law comes from several different sources.

First, the intent section of the "Trespass to Land" chapter of *Maine Tort Law* states, "The minimum intent necessary for the tort of trespass to land is simply acting for the purpose of being on the land or knowing to a substantial certainty that one's act will result in physical presence on land. It is not necessary that a defendant know or have reason to know that his presence on land is wrongful." Simmons, Zillman & Furbish, *Maine Tort Law* § 5.13 at 5-23 to -24 (2018 ed. 2017). Moreover, "A good-faith belief in one's own right to be on the land and good faith reliance on one's own deeds are no defense. The boundary and title cases all necessarily, albeit implicitly, support that proposition." *Id.* § 5.13 at 5-24.

Second, a relatively recent United States District Court case summarized Maine law on the issue:

> "Under Maine law, common-law trespass and statutory trespass share a common element: the defendant's intentional entry onto another person's property. See Hayes v. Bushey, 160 Me. 14, 196 A.2d 823, 824 (Me. 1964); 14 M.R.S.A. § 7551-B(1). "The minimum intent necessary for the tort of trespass is simply acting for the purpose of

15

being on the land or knowing to a substantial certainty that one's act will result in physical presence on the land." Gibson v. Farm Family Mut. Ins. Co., 673 A.2d 1350, 1353 (Me. 1996) (quoting Jack H. Simmons et al., *Maine Tort Law* § 5.13, at 5-22 (2004); *see also* Prosser and Keeton § 13, at 73 ("The intent required . . . is simply an intent to be at the place on the land where the trespass allegedly occurred."). Of course, "a person may trespass without intending to trespass": intentional presence suffices. United States Fidelity and Guar. Co. v. Goodwin, 950 F. Supp. 24, 27 n.2 (D. Me. 1996); *see also Hayes,* 196 A.2d at 825 ("It is necessary to keep in mind the distinction between the intention to do a wrongful act or commit a trespass and the intention to do the act which results in or constitutes the intrusion."). Darney v. Dragon Prods. Co., LLC, 640 F. Supp. 2d 117, 123-24 (D. Me. 2009).

Accordingly, the court concludes that by going onto McHatten property and cutting down the chain link fence, Mr. Ballerstein has committed a statutory trespass pursuant to M.R.S. §7551-B and he is subject to its statutory remedies.

> Count 6: Each plaintiff has claimed damages pursuant to statutory trespass as provided for within 14 M.R.S. § 7552.

Having sustained her claim for statutory trespass pursuant to 14 M.R.S. § 7551-B, McHatten is barred from pursuing any claim pursuant to 14 M.R.S. § 7552.

> Count 7: Each plaintiff has claimed damages for conversion.

The damages available for the tort of conversion are identical to the damages available for statutory trespass pursuant to 14 M.R.S. § 7551-B. A plaintiff is limited to one recovery and therefore the court does not further address this claim.

> Count 8: Each plaintiff has claimed damages for the intentional infliction of mental distress.

16

In order to prevail on her claim for the intentional infliction of mental distress, McHatten must prove that it is more likely than not that:

1. The Ballersteins, or either of them, engaged in conduct that intentionally or recklessly caused severe emotional distress, or that the Ballersteins, or either of them, were certain or substantially certain that severe emotion distress would result from their conduct.

2. The conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious and utterly intolerable; and

3. McHatten suffered severe emotion distress as a result of the Ballersteins' conduct.

The concept of "serious emotional distress" means something more than minor psychic and emotional shocks, something more than the usual and insignificant emotional traumas of daily life in modern society. Serious emotional distress means mental stress, created by the circumstances of the event, that a reasonable person, normally constituted, would be unable to adequately endure.[19]

A person acts "intentionally" with respect to a result of his conduct when it is his conscious object to cause such a result. A person acts "recklessly" with respect to the result of his conduct when he consciously disregards a risk that his conduct will cause such a result. The disregard of that risk, when viewed in light of the nature and purpose of the person's conduct and the circumstances known to him, must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation.[20]

Although it is evident that all parties to this litigation experienced varying levels of upset, exasperation, frustration, pique, and anxiety, the court is not persuaded that McHatten's emotional responses rose to that level of severe emotional distress that the law requires be proved by a preponderance of the evidence. Further, however unneighborly the Ballersteins

[19] See *Alexander, Maine Jury Instruction Manual* § 7-72 (2017)
[20] See 17-A M.R.S. § 35.

17

might have appeared to McHatten to have been, the court is not persuaded that the Ballersteins, or either of them, acted either intentionally or recklessly for the purpose of causing McHatten emotional distress.

Accordingly, the court finds for the Ballersteins on this claim.

Count 9: Each plaintiff has claimed damages for the negligent infliction of mental distress.

In order to prevail on a claim for the negligent infliction of mental distress, McHatten must prove by a preponderance of the evidence each of the following elements:

1. That the Ballersteins, or either of them, were negligent, that is, that they did something which an ordinary, careful person would not do or they failed to do something which an ordinary, careful person would do considering all of the circumstances of the case. That is, McHatten must prove that the Ballersteins, or either of them, failed to use ordinary care in their interaction with McHatten; and

2. That it was reasonably foreseeable that McHatten would suffer emotional distress as the result of the Ballersteins' negligent conduct; and

3. That McHatten suffered serious emotional distress as a result of the Ballersteins' conduct.

The court need only consider the third element in order to rule on this claim. Although McHatten undoubtedly suffered an emotional response to the Ballersteins' actions that could be described as "emotional distress" for her, the court is unpersuaded that it rose to the level of "severe emotional distress that no reasonable person could be expected to endure." A failure of proof on this element obviates the need to address the other elements.

On this claim, the court finds for the Ballersteins.

2. THE HAFFORD CLAIMS.

Count 1: Each plaintiff seeks a declaratory judgment regarding the common boundary shared with the Ballersteins.

18

The court also accepts Mr. Roix's opinion regarding the location of the common boundary shared by the Ballersteins and the Haffords. This boundary is indicated by the highlighted yellow line on Plaintiff's Exh. 10A. As noted above, both the Ballerstein deed and the Hafford deed contain multiple calls for distances that are "more or less". In the court's view, this creates deed descriptions that are only "approximate." Determining the probable location of the intended boundaries necessitates the kind of comprehensive review of relevant deeds and field work that Mr. Roix undertook.

There are several aspects of the evidence that would appear to support Mr. Roix's opinion regarding the location of the Hafford boundary as being more northerly than that for which the Ballersteins advocate. He notes that in 1959, Merlon and Isabelle Wiggin acquired the land out of which both the Ballerstein and Hafford lots were created. The Wiggins then conveyed part of this lot to Burton and Wilma Tompkins. (See Plaintiff's Exh. 20)[21] The description of the Wiggin to Tompkins deed is the same as that set forth in the Ballerstein deed. At about the same time as this conveyance, i.e. October of 1959, Richard Holmes prepared a survey primarily of the lot retained by Wiggin but also showing part of the Tompkins' lot to the north and a lot measuring 12' by 125' that was at some point conveyed to Joseph and Gloria Olore. (See Plaintiff's Exh. 21) What is significant to the court about the survey, made very close in time to the Wiggin to Tompkins conveyance, is that it shows that the disputed boundary line lies to the north of the building that is also shown on the survey. This building is the Hafford home. The boundary location being advocated by the Ballersteins places the boundary literally at the very

---

[21] Presumably this deed was signed and acknowledged by the grantors. The exhibit consists only of the first page and does not contain a signature or acknowledgement page that would reflect the date of conveyance. Mr. Roix suggested the conveyance occurred in August of 1959. There is a handwritten notation in the margin that the court cannot entirely decipher but does include a reference to a date of October 16, 1959. The court infers that this was the date the deed was probably received in the registry.

edge of the physical structure of the Hafford home. The court shares Mr. Roix's view that it was very unlikely that Mr. and Mrs. Wiggin would have made a conveyance to Tompkins (now Ballerstein) intending a southerly boundary for Tompkins that came within inches of the side of their home.

The court notes that the Richard Holmes survey of April 1976 (See Plaintiffs' Exh. 13) also shows what the court infers to be the northerly side of the Hafford home and depicts a boundary line at least a few feet to the north of the home.[22]

The court is persuaded that the best solution reconciling all of the available information, albeit not a perfect solution, is the solution adopted by Mr. Roix. This is a solution predicated upon his analysis of the "complete picture" regarding the conveyances in the vicinity of the corner lots of Dupont Drive. Mr. Roix's deed research and review; his field work and his logical analysis make sense to this court and accordingly the court concurs that the Hafford northerly boundary is that line which Mr. Roix has highlighted in yellow on Plaintiff's Exh. 10-A. The court also finds that the line of spruce trees referred to herein (Count 6) were located on the Hafford property.

> Count 2: Each plaintiff contends they have established title to disputed land according to the principles of the doctrine of adverse possession.

Although the court's determination regarding the location of the Haffords' northerly boundary as set forth above obviates the need for any extended discussion of their claim for adverse possession[23], it is worthy of note that the Ballersteins essentially concede the possibility

---

[22] The court notes that although there is no symbol key that would support this opinion, the survey also appears to show what looks like a fence along the McHatten and Ballerstein boundary that would support an inference that the chain link fence and footer fell on the McHatten side of the line.

[23] A party claiming title by adverse possession has the burden of proving, by a preponderance of the evidence, that possession and use of the property was (1)actual; (2)open; (3) visible; (4) notorious; (5) hostile; (6) under claim of right; (7)continuous; (8) exclusive; (9) for a duration exceeding the twenty-year limitations period." Weeks v Krysa, 2008 ME 120, ¶12, 955 A.2d 234.

that the Haffords might have established ownership of at least that part of the property upon which the Hafford driveway and retaining wall are located[24]. Moreover, the long term (in excess of 20 years) use of the driveway and retaining wall coupled with the Hafford's mowing of the grass up to the Lavin's split rail fence and their general use of their backyard area for a variety of other purposes including a swimming pool for grandchildren would make it seem likely to the court that they would have established adverse possession at least along a straight line at the northerly edge of the retaining wall back along the line of spruce trees to the easterly bound of their property. To limit that line just to the outline of the driveway and retaining wall would produce a "zig zag" property line that could not be reconciled with the facts or common sense. Notwithstanding this observation, the controlling determination of the court is that the Hafford northerly boundary is as opined by Mr. Roix.

> Count 3: Each plaintiff contends they have established title to disputed land according to principles of the doctrine of title by acquiescence.

Because the court has determined the location of the Hafford northerly boundary as set forth above in Count 1, it is unnecessary to address the claim set forth in Count 3.

> Count 4: Each plaintiff claimed damages for common law trespass.

Because the Haffords have abandoned any claim for common law trespass, it is unnecessary to address the claim set forth in Count 4.

> Count 5: Each plaintiff has claimed damages pursuant to statutory trespass as provided for within 14 M.R.S. § 7551-B.

The line of spruce trees along the Hafford northerly boundary is the focus of the Hafford claims for statutory trespass. Mr. Roix's opinion, accepted by the court, places the spruce trees on the Hafford side of the boundary. However, in the court's view, the Haffords have failed to

---

[24] See Defendants' Closing Argument, page 18.

establish that the cutting of spruce branches falls within the prohibited conduct set forth in 14

M.R.S. § 7551-B (1)(A) or (B). In any event, because the court sustains the Hafford claim

pursuant to 14 M.R.S. § 7552; the claim set forth in Count 5 is barred.

> Count 6: Each plaintiff has claimed damages pursuant to statutory trespass as provided for within 14 M.R.S. § 7552[25].

---

[25] The relevant parts of 14 M.R.S. § 7552 provide:
> § 7552. Injury to land, forest products or agricultural products
> 1. Definitions. As used in this section, unless the context otherwise indicates, the following terms have the following meanings.
>
> B. "Christmas tree" and "evergreen boughs" have the same meanings as provided in Title 12, section 8841.
>
> C. "Forest products" means evergreen boughs or cones or other seed products.
>
> E. "Professional services" may include:
> > (2) A boundary survey
> > (4) Attorney's fees for preparing the claim and bringing a court action.

2. Prohibitions. Without permission of the owner a person may not:

> A. Cut down, destroy, damage or carry away any forest product....or property of any kind from land not that person's own; or

3. Measure of damages. This subsection governs the measurement of damages resulting from a violation of subsection 2.

> A. When...forest products have been destroyed or carried away, the owner may recover as damages either the value of the lost products themselves or the diminution in value of the real estate as a whole resulting from the violation, whichever is greater.

4. Damages recoverable. Damages are recoverable as follows.
> A. A person who negligently or without fault violates subsection 2 is liable to the owner for 2 times the owner's damages as measured under subsection 3 or $250, whichever is greater.
>
> B. A person who intentionally or knowingly violates subsection 2 is liable to the owner for 3 times the owner's damages as measured under subsection 3 or $500, whichever is greater.
>
> D. A person who with malice violates subsection 2 is subject to punitive damages in addition to the damages under paragraphs A, B and C.

5. Costs and fees. In addition to damages, interest and costs, the owner may also recover from the person who violates subsection 2 the reasonable costs of professional services necessary for determining damages and proving the claim as long as the person first has written notice or actual knowledge that a claim is being asserted.

8. Other actions barred. A recovery from a defendant under this section bars an action to recover damages under section 7551-B from that defendant for the same specific damage.

12 M.R.S. § 8841 provides in relevant part:
> For the purpose of this Article the following terms shall have the following meanings.

A line of at least 4 mature spruce trees were located long the northerly border of the Hafford property since they acquired title in 1974[26]. The court finds that these trees were in fact located within the Hafford property. In August of 2017, the lower branches of these spruce trees extended all the way to the ground and essentially created a privacy barrier for the Haffords. The court accepts Mrs. Hafford's testimony that Mr. Ballerstein cut the lower branches off each tree up to a height of approximately eight (8) feet and that he did so without permission. Mr. Ballerstein later cut down each tree and removed the stumps. Although Mrs. Hafford began to regret her decision almost immediately and although she might have felt some initial social pressure to avoid conflict with her neighbor, she did in fact give Mr. Ballerstein permission to cut down the trees as he did. Accordingly, the focus of inquiry with regard to this claim must be the initial cutting of branches that Mr. Ballerstein did without permission.

The statute prohibits the cutting down, damaging or destroying "forest products" among other things. On its face, it would appear that evergreen boughs, i.e. branches, fall within the definition of "forest products." However, "evergreen boughs" has the same meaning as appears in 12 M.R.S. §8841. The relevant parts of that statute provide:

> For the purpose of this Article the following terms shall have the following meanings.
>
> 2. Evergreen boughs. "Evergreen boughs" means boughs or tips of all species of coniferous trees cut for *commercial purposes.*(emphasis supplied)

There is no doubt that a spruce tree is a coniferous tree and that Mr. Ballerstein cut evergreen boughs (branches) from these spruce trees without permission of the owner. However, there is

---

2. Evergreen boughs. "Evergreen boughs" means boughs or tips of all species of coniferous trees cut for *commercial purposes.*

[26] The tops of these trees can be seen in Plaintiffs' Exh. 4 along with the shadows they cast into the Ballerstein property.

no evidence that he did so for *commercial purposes* and this would appear to be a required element of proof to bring the branches within the definition of "forest products."

Notwithstanding this conclusion however, 14 M.R.S. § 7552 provides:

2. Prohibitions. Without permission of the owner a person may not:

A. Cut down, destroy, damage or carry away any forest product...*or property of any kind* (emphasis supplied) from land not that person's own.

This "catch all" provision would appear to bring the branches that Mr. Ballerstein cut back within the prohibition provisions of the statute, notwithstanding that the branches were not cut for commercial purposes.

It seems clear that the Ballersteins engaged in the actions they did under a mistaken belief that they owned the spruce trees. As the case law has developed, it appears that the question of whether the trespasser's conduct was "negligent or without fault" contemplates a more subjective and deliberate willfulness', equating with an awareness of their own trespass.[27] The evidence fails to establish that the Ballersteins' conduct was "negligent or without fault" and it does not establish that they acted with actual malice.

Finally, the court notes that 14 M.R.S. § 7552 (5) requires that a trespasser must have received written notice or have actual knowledge of his trespass before the reasonable costs of professional services become implicated. There is no evidence that the Haffords ever provided written notice to the Ballersteins before any of their offending actions. This fact would foreclose an award for professional services under this statute. Such actual damages as may be proven at

---

[27] In the court's view, an award of damages pursuant to 14 M.R.S. § 7552(4)(b) is not implicated by the evidence in this case. The Law Court has indicated that in order for a cutting to be done "knowingly", the trespasser must be subjectively aware that he is acting improperly. In order for a cutting to be done "willfully" the trespasser must display an utter and complete indifference to and disregard for the rights of others. A mistake as to a boundary does not rise to this level. See Bonk v McPherson, 605 A.2d 74,78 (Me. 1992)

hearing and an award of interest and costs pursuant to court rules and related statutes are not foreclosed.

The court finds for the Haffords against the Ballersteins on this claim as provided for herein.

Count 7: Each plaintiff has claimed damages for conversion[28].

The Ballersteins have converted the Haffords' branches cut from the spruce trees. However, the court has already found that the Haffords are entitled to an award of damages upon the claim set forth in Count 6. The measure of damages would be identical to any award for conversion and accordingly, the court does not further discuss this claim.

Count 8. Each plaintiff has claimed damages for the intentional infliction of mental distress.

The court finds that Mrs. Hafford has suffered emotional distress as the result of this litigation. The court accepts her testimony that she has experienced significant anxiety and upset and that she visited with her physician in search of relief. Notwithstanding these facts, as discussed in connection with the McHatten claim, in order to recover for a claim of intentional infliction of mental distress, a plaintiff must prove that the defendant acted either intentionally or recklessly. However unneighborly the Ballersteins may have conducted themselves, the court cannot find that they acted intentionally for the purpose of causing Mrs. Hafford mental distress, or in the alternative, that they did so recklessly.

The court finds for the Ballersteins on this claim.

---

[28] The elements of the tort of conversion are: (1) a showing that the person claiming that his property was converted has a property interest in the property; (2) that he had the right to possession at the time of the alleged conversion; and (3) that the party with the right to possession made a demand for its return that was denied by the holder. Where property is taken unlawfully, there is no requirement that the plaintiff prove a demand for return. See Simmons, et al, *Maine Tort Law* (2004) §6.09.

Count 9: Each plaintiff has claimed damages for the negligent infliction of mental distress.

As the court discussed in connection with the McHatten claim for the negligent infliction of mental distress, a required element of proof is that a plaintiff suffer "serious emotional distress" *as the result of a defendant's negligent actions*. The court does not mean to discount the level of stress and anxiety that Mrs. Hafford has experienced. The court is very well aware that litigation is an enormously stressful personal experience and that significant anxiety is often its inevitable byproduct. However, the burden is upon the plaintiff to prove that it was a *specific negligent act of the defendant* that caused his or her mental distress. The kind of mental distress that accompanies another person's ill humor or unneighborly behavior or the stress of resulting litigation does not fall within the parameters of the tort as this court understands it. Accordingly, the court finds for the Ballersteins on this claim.

3. THE BALLERSTEIN CLAIMS

Count 1: Defamation of character

The Ballersteins' counterclaim pleading fails to state with any particularity the specific statements attributable to each Plaintiff upon which the Ballersteins rely for their claims. Their counterclaim pleadings are essentially that the "Plaintiffs" all slandered "us." Focusing on those claims set forth within their closing argument and regarding any and all other claims as having been abandoned, the claims appear to be as follows:

1. McHatten accused Mr. Ballerstein of subjecting his children to "slave labor" which would constitute a violation of child labor laws[29].

---

[29] It appears that the Mr. Ballerstein contends the same statement was made on two separate occasions. The court makes the same findings with regard to each such statement.

26

2. Mr. Hafford stated that Mr. Ballerstein did not perform his professional duties [as a school teacher].

3. McHatten talked about the Ballersteins with passersby on the bike path.

4. The Haffords and McHatten have all slandered the Ballersteins to their neighbors.

5. The "plaintiffs" have slandered the Ballersteins to the plaintiffs' lawn maintenance workers.

In order to prevail on a claim for defamation in the form of slander, i.e. spoken words as distinguished from written words i.e. libel, a plaintiff must prove that the speaker:

1. Made a false and defamatory statement concerning another;

2. Made an unprivileged publication to a third party;

3. That the speaker was at fault, or was at least negligent; and

4. The communication was either actionable irrespective of special harm or the subject of the communication in fact suffered special harm[30].

1. McHatten accused Mr. Ballerstein of subjecting his children to "slave labor" which would constitute a violation of child labor laws.

The court finds that McHatten provided the more reliable account of the circumstances that underlie this claim. The court accepts her account of the interaction between herself and Mr. Ballerstein and rejects his account.[31] According to McHatten, shortly after the Ballersteins moved into their property, she noticed that Mr. Ballerstein was outside raking leaves with his children. There is no record evidence regarding which of the Ballersteins' four children were

---

[30] Special harm generally refers to an "actual injury"; either economic loss or an impairment of reputation and standing in the community, personal humiliation or mental anguish and suffering. The law has recognized that some communications can amount to "slander per se", that is, that some communications are so likely to cause injury that they are actionable even in the absence of proven actual injury. See generally, Simmons, et al, *Maine Tort Law* (2004 ed.) §13.16

[31] A fact-finder decides the believability of witnesses and may selectively accept, reject, or combine testimony in any way. See Alexander, *Maine Jury Instruction Manual* (2017) Comment citing Readron v Larkin, 2010 ME 86, ¶¶ 14-17.

present at the time or if all of them were present. There is no record evidence of the ages of these children or of what their level of comprehension might have been. There is no record evidence of what their proximity to McHatten and Mr. Ballerstein might have been at the time of any statement that McHatten made. There is no admissible evidence from the children regarding what they might have heard or what they might have understood from the words spoken. The court accepts McHatten's testimony that she made a reference to "child labor laws" as a joke. The court finds that McHatten's statement was intended as an attempt at humor and a simple neighborly pleasantry intended as a preliminary attempt to "break the ice" with a new neighbor.

The first question then is whether McHatten made a defamatory statement at that time. The court finds that she did not. As we see in Maine's leading treatise on this subject, "The allegedly defamatory communication must be read in context. The context typically includes the entire publication together with all extrinsic circumstances known to the recipients. A communication should be interpreted as it would be reasonably understood, [not by the claimant but by the listener] under the circumstances...Conversely, a statement that may appear defamatory on its face could have been made in circumstances that would not lead persons to believe the words had been spoken seriously or truthfully." [32]

Keeping in mind that a central consideration regarding defamation is whether the communication had some tendency to lower a person's standing in the estimation of the community or to deter third persons from associating or dealing with him, this court concludes that no reasonable person could have interpreted McHatten's comment as anything other than a joke and no reasonable person could conclude that it would have had any potential whatsoever to

---

[32] See Simmons et al, *Maine Tort Law* (2004 ed.)§ 13.04.

reduce Mr. Ballerstein's reputation or standing in the community in the eyes of his children or in any way to deter them from interacting with him.

Accordingly, Mr. Ballerstein cannot sustain a claim for defamation predicated upon McHatten's reference to child labor laws in the presence of his children because such a statement in those circumstances was simply not defamatory. The court finds for McHatten on this claim.

    2. Mr. Hafford stated that Mr. Ballerstein did not perform his professional duties [as a school teacher].

In support of his claim, Mr. Ballerstein testified that on one occasion Mr. Hafford told him that [Mr. Ballerstein] "did not do any work at his job." He testified that the statement was made in the presence of Mr. Hafford's adult son Sammy. There is scant record evidence of the circumstances surrounding the making of this statement. As already indicated herein, statements alleged to be defamatory must be considered in context. Moreover, it is the effect upon the listener that matters, not the effect upon the claimant. That Mr. Ballerstein interpreted the statement to mean that he was unfit to be a school teacher does not suffice.

Also, this court has no way of knowing whether Mr. Hafford was communicating an opinion that teaching school was not real work as opposed to some other form of more physical labor or whether he had somehow become familiar with Mr. Ballerstein's actual job performance as a school teacher and believed that it was substandard. On this record, there is simply no way to know whether Mr. Hafford was expressing an opinion that school teachers in general were overpaid or whether he was seeking to make some other point. There is no record evidence to indicate to the court whether Mr. Hafford's statement was a serious one or one made in jest.

Under Maine law, allegations that would adversely affect one's fitness for the proper conduct of a business, trade, profession, or public or private office are actionable without proof

of special damages. The Law Court has written "Specifically, the term *slander per se* refers to words that on their face without further proof or explanation injure the plaintiff in his business or profession, i.e. they are deemed to be defamatory by themselves. In this case [referring to the case before the court then on appeal] we are concerned with words that are actionable per se, that is, words that when considered in the circumstances surrounding their utterance adversely reflect on the [claimant's] business or occupation." Ramirez v. Rogers, 540 A.2d 475, 478 (Me. 1998)

Mr. Ballerstein had the burden of proof on this claim, including the burden of proving that Mr. Hafford made a defamatory statement. The words spoken are not defamatory on their face. Defamation could only be found after consideration of the surrounding circumstances of their utterance. Without more evidence of those circumstances than appears in this record, Mr. Ballerstein has failed to persuade this fact finder that Mr. Hafford made a defamatory statement that would support the claim. The court finds for Mr. Hafford.

  3. McHatten talked about the Ballersteins with passersby on the bike path.
  4. The Haffords and McHatten have all slandered the Ballersteins to their neighbors.
  5. The "plaintiffs" have slandered the Ballersteins to the plaintiffs' lawn maintenance workers.

The court discusses the remaining three claims collectively because they all suffer from the same fatal defect. The court has no idea what specific statements attributed to any of the Plaintiffs the Ballersteins contend were defamatory. The court simply has no record evidence upon which even to begin making a determination regarding whether any of the Plaintiffs made any statement that might be regarded as defamatory. The Ballersteins seek to make claims for injury to reputation predicated upon observations that McHatten was seen speaking with passersby; upon a general non-specific allegation that both Plaintiffs have slandered them to their neighbors; upon a further non-specific allegation that "the Plaintiffs" have slandered the Ballersteins to the Plaintiffs' own lawn maintenance workers. The Ballersteins have provided no

30

evidence of what statements they contend were defamatory or any evidence of the time, place or actual circumstances surrounding these allegations of defamation. They have failed in meeting their burden of proof. [33] On defamation claims 3, 4 and 5, the court finds for each Plaintiff.

Count 2: Intentional Infliction of Emotional Distress

The court has no difficulty in finding that this litigation experience has been as much a source of anxiety and frustration for the Ballersteins as it has been for the Plaintiffs. However, that does not prove that any of the plaintiffs have "intentionally or recklessly" engaged in behaviors for the purpose of causing either or both Ballersteins severe emotional distress or engaged in behaviors representing a gross deviation from the standard of conduct that a reasonable person would have observed in the same situation or where they consciously disregarded a risk that their conduct would cause severe emotional distress. The Ballersteins have also not proven that they suffered "severe emotional distress" as the court has discussed herein. What the Ballersteins have demonstrated is that they appear to be persons with heightened sensitivities to perceived affronts. It is clear that they are easily offended. In this court's view, this has distorted their perceptions of circumstances and has made the court slow to accept their accounts of disputed events. The court finds for the Plaintiffs on the Ballersteins' claim for the intentional infliction of emotional distress.[34]

INJUNCTION

---

[33] The court rejects the Ballersteins' argument that the Plaintiffs' responses to counterclaim allegations of "lacking information sufficient to form a belief as to the truth or falsity of the allegation" amount to admissions. M.R.Civ. P. 8(a) requires the claimant to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." M.R.Civ.P. 8(b) provides in part, "If the party is without knowledge or information sufficient to form a belief as to the truth of an averment, the party shall so state and this has the effect of a denial." In light of this rule, it would be the Ballersteins' pleadings that are defective rather than the Plaintiffs'.

[34] Having determined that the Ballersteins have failed to demonstrate their entitlement to general damages, it is unnecessary to consider the issue of punitive damages.

In connection with the filling of their complaint, the Plaintiffs also filed a Motion for a Preliminary Injunction. As indicated herein, the parties reached an informal agreement to maintain the "status quo" during an early stage of these proceedings and accordingly, the court deferred taking any action upon the request for injunctive relief. Pursuant to the provisions of M.R.Civ.P. 65 (b)(2) the court has consolidated the request of an injunction with the hearing on the merits. Although there are questions regarding damages that remain for the second part of the bifurcated hearing, the principal contests between the parties were with regard to their common boundaries. The court has now addressed those disputes. The remaining questions regarding damages need not delay the court issuing its Order for injunction relief.

Therefore, the court Orders as follows:

1. The Defendants Paul F. Ballerstein and Goldie E. Ballerstein (the Ballersteins) are Ordered to cease and desist from any further interference with Penelope McHatten's and with Kenneth B. Hafford's and Susan P. Hafford's use and enjoyment of their respective properties, the boundaries of which are established herein.

2. As soon as is reasonably practical, but no later than May 15, 2020, the Ballersteins shall at their own expense remove any and all markers purporting to be survey pins or boundary markers of any kind that they or their agents have placed on property determined to belong to McHatten or the Haffords herein[35]. At the conclusion of this litigation and upon the court's judgment becoming a final judgment without further right of appellate review, either McHatten

---

[35] At the conclusion of this litigation and only upon the court's judgment of this date becoming a final judgment, the Plaintiffs may at their own election and expense prepare an abstract of the court's decision and record the same in the Southern Aroostook Registry of Deeds. That abstract shall simply state that "The Survey of Bridgham Engineering & Land Surveying, Inc. recorded at Volume 43 Page 30A does not reflect the easterly boundary of the property of Penelope McHatten (Book 3432 Page 222) or the northerly boundary of the property of Kenneth B. Hafford Jr. and Susan P.Hafford (Book 1152 Page 300) as reflected in the judgment of the Superior Court in CARSC RE-2018-53." Any such abstract shall be submitted to the Superior Court for certification prior to recording.

or the Haffords or both of them, at their own option and expense, may cause appropriate boundary monuments reflecting the court's judgment herein to be placed upon their respective properties. When and if the court's judgment becomes a final judgment and if they so choose, they may also cause a final survey reflecting the court's judgment to be prepared and may record the same in the Southern Aroostook Registry of Deeds.

3. As soon as is reasonably practical, but no later than May 15, 2020, the Ballersteins shall remove any fencing they have placed upon property that the court has now determined to belong to McHatten or the Haffords.

4. As soon as is reasonably practical, but no later than May 15, 2020, the Ballersteins shall remove any stones, rocks, or other materials of any kind that they have caused to be placed upon property the court has determined to belong either to McHatten or to the Haffords.

The court directs the Clerk to schedule a hearing on damages at such time and place as the court's schedule permits but no sooner than 30 days from the date of this decision and Order.

Finally, the court is inclined to borrow from the wisdom of Hon. Edward S. Godfrey III, former dean of the University of Maine School of Law and Associate Justice of the Maine State Supreme Court. At the conclusion of the Law Court's decision in Proctor v. Hinkley, 462 A.2d 465 (Me. 1983), and as he reversed a referee's decision in a boundary dispute, Justice Godfrey wrote, "It is regrettable that [the referee's] definition of the parties' common boundary must be undone because of technical error when the only practical result is to leave unsettled the ownership of a *few square feet of terrain having little economic value* (emphasis supplied). This Court urges counsel for both parties to try to persuade their clients to enter into some practical but formal and recordable agreement locating the boundary line in question."

This court offers similar encouragement to the parties in this case. Although the court has done its best and feels that it has decided the issues correctly, it suffers from no illusion that its judgment is completely and absolutely free from error and recognizes that other wiser minds might reach a different set of conclusions. If that should come to pass, the parties may have yet another opportunity to make a further investment of their time, money and mental health in the continued litigation of their respective contentions in this case. On the other hand, the parties may benefit from reflecting on whether the value of a few feet, perhaps only a few inches, of disputed property that is of little economic value is really greater than the personal cost that each might pay if they choose to pursue potentially endless litigation. The opportunity that each party has to bring an end to litigation and to reach a final result they could define for themselves remains.

The forgoing reflects the court's decision on the first part of a bifurcated hearing. It is not a final judgment subject to appeal. The court will issue a final judgment at the conclusion of the hearing on damages and that judgment will be subject to appellate review by either party in all respects if they so choose.

The entry shall be: The court has concluded the first part of a bifurcated trial and declared its judgment regarding the location of disputed boundaries. It has also rendered decisions regarding liability on the civil claims. The Clerk is directed to schedule the second part of the bifurcated trial for a hearing on damages.

Date: 1/29/20

E. Allen Hunter
Justice of the Superior Court (Active Retired)

ENTERED ON THE DOCKET 1/31/20

34

STATE OF MAINE
AROOSTOOK, ss

SUPERIOR COURT
DOCKET NO. CARSC-RE-2018-53

PENELOPE MCHATTEN )
               Plaintiff )
                   )
                   )
And )
                   )
                   )
                   )
KENNETH B. HAFFORD and )
SUSAN P. HAFFORD )    ORDER ON MOTION IN LIMINE
              Plaintiffs )
                   )
                   )
Vs )
                   )
                   )
PAUL F. BALLERSTEIN and )
GOLDIE E. BALLERSTEIN )
              Defendants )

Pending before the court is the Plaintiffs' Motion *In Limine*. The motion asks for multiple rulings from the court in advance of the trial now scheduled to commence on October 28, 2019. Specifically, the motion seeks the following rulings:

1.    That the averments of facts set forth in Counts I through IX of its complaint be deemed admitted based on the Defendants' failure to respond to those averments in accordance with the requirements of M.R.Civ. P. 8(d).

2.    That the Defendants have waived any and all general defenses to Plaintiffs' complaint and any and all M.R.Civ.P 8 (c) and12(b) affirmative defenses to the complaint.

3.    That the Defendants be precluded from calling any expert witnesses at trial for failure to comply with the requirements of Paragraph 2 of the court's November 9, 2018 scheduling Order.

4.    That the Defendants be precluded from challenging any of the Plaintiffs' expert witness opinions at trial.

5.    That the Defendants be precluded from introducing *direct testimony* through the use of a "learned treatise".

1

6.  That the Defendants be precluded from introducing evidence in support of their counterclaim for defamation.

7.  That the Defendants be precluded from introducing evidence in support of their counterclaim for the intentional infliction of emotional distress.

## DISCUSSION

The court begins its discussion with several general principles in mind. M.R.Civ.P 1 provides in part that the civil rules of procedure "shall be construed to secure the just, speedy and inexpensive determination of every action." M.R.Civ.P. 9(f) provides that "All pleadings shall be so construed as to do substantial justice". Additionally, the court reminds that there is only one set of court rules in effect in Maine and *pro se* parties are subject to the same standards as represented parties. A failure to observe the requirements of court rules can have serious consequences. (See e.g. Learned v Inhabitants of Van Buren, 182 F. Supp. 2d (2002) where the court (J. Singal) found the Plaintiff's response to the Defendant's Motion for Summary Judgment to be inadequate for its failure to comply with the " corresponding numbered paragraphs" requirement and for its departure from the rule's "short and concise" requirement. In that case, the Plaintiff, although represented by experienced counsel, filed a response that not only failed to comply with the rule's requirement that the Plaintiff respond paragraph by paragraph to the Defendant's submission but the response also included a "mélange of supported and unsupported facts, legal conclusions, speculations and hearsay." J. Singal observed that however convenient the Plaintiff might have found his response to be, the format that the court found most convenient was the one set forth in the rule. J. Singal went on to write, "Some of the statements are not facts at all. Furthermore, many of Plaintiff's statements do not actually controvert the Defendant's facts that they purport to address. Most importantly, the words, "admit," "deny" and qualify" simply do not appear in Plaintiff's pleading. The court is not required to pore through

2

the record and try to glean which of the Plaintiff's statements admits, denies, or qualifies which of the Defendant's." The court deemed Plaintiff's submissions to be inadequate for their failure to comply with technical requirements of the rules for summary judgment and found the facts set forth by the Plaintiff to have been admitted.") The point that this court is trying to make is that following the requirements of the rules is important for every litigant, represented or unrepresented and failure to do so can have serious consequences.

The court finds an additional requirement to be worth pointing out. M.R.Civ. P. 12(f) provides that on its own initiative, at any time, the court may order "stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."

Finally, M.R.Civ.P. 7(b) (7) provides in part, "Except as otherwise provided by law or these rules, after the opposition is filed, the court may in its discretion rule on the motion without hearing." The court finds the present motion to be one that it can address without further hearing and therefore issues the following Order.

## ORDER

1.  Should the averments of facts set forth in Counts I through IX of its complaint be deemed admitted based on the Defendants' failure to respond to those averments in accordance with the requirements of M.R.Civ. P. 8(d)?

The court concludes that the answer to this question is "no". While it is true that the Defendants have not filed an answer that complies strictly with M.R.Civ.P. 8 (b), after engaging in the somewhat laborious process of construing the Defendants' non-standard responsive pleading and its similar response to the Plaintiffs' motion, the court finds that justice favors a liberal construction and leads the court to conclude that the Defendants' have sufficiently placed the Plaintiffs and the court on fair notice that they dispute the location of the common boundary lines that are the central issues in this litigation. The Plaintiffs' primary request is that the court

3

declare the location of those common boundaries. The Defendants have adequately given notice that they dispute the Plaintiffs' contentions regarding the location of the common boundaries. The court finds their response to be sufficient to constitute a "general denial " answer within M.R.Civ.P. 8(b). Accordingly, the court denies this first request.

Notwithstanding this conclusion, the court feels constrained to point out that both in their responsive pleading to the complaint and in their response to the Plaintiffs' motion, the Defendants have engaged in an objectionable *ad hominem* narrative directed at the Plaintiffs, their attorney and their designated expert witness. In the exercise of its discretion and pursuant to M.R.Civ. P. 12 (f), on its own motion the court strikes from the Defendants' complaint and from its response to the Plaintiffs' Motion *in Limine* all of the gratuitous insults, irrelevant assertions of perceived facts and subjective opinion set forth within those submissions. Not only is such diatribe contrary to the manner in which this court conducts its proceedings, it is entirely unhelpful to the court in considering the merits of the Defendants' legal positions. Accordingly, the court disregards what it finds to be the impertinent aspects of the Defendants' pleadings.

When this matter proceeds to trial, the parties should be aware that the court finds reasoned argument based on the record evidence and on the governing principles of law to be far more persuasive than name calling and the casting of aspersions.

2. Should the court find that the Defendants have waived any and all general defenses to Plaintiffs' complaint and any and all M.R.Civ.P 8 (c) affirmative defenses to the complaint?

The court concludes that the Defendants have failed to raise any of the affirmative defenses set forth in M.R.Civ.P. 8(c) or any of the defenses set forth in M.R.Civ. P. 12(b). These are defenses that must be specifically set forth in a defendant's responsive pleading or they are deemed to be waived. The Defendants have not raised any of these defenses and accordingly

4

they are deemed to be waived. This part of the Plaintiffs' motion is granted. The Defendants shall be foreclosed from reliance upon any of those designated affirmative defenses or those set forth within M.R.Civ.P. 12 (b).

As indicated above however, the court has found the Defendants' responsive pleading to be the substantial equivalent of a "general denial" sufficient to place the determination of the locations of the common boundaries fairly in issue for trial. Accordingly, the Defendants may generally defend against the Plaintiffs' contentions at trial.

3.      Should the Defendants be precluded from calling any expert witnesses at trial for failure to comply with the requirements of Paragraph 2 of the court's November 9, 2018 scheduling Order?

This request shall be granted without objection. The Defendants do not dispute that they have not designated any expert witness. In fact, within their responses to the Plaintiffs' motion, the Defendants candidly state, "And their points about not allowing the Ballersteins to add on an expert witness after the window of opportunity has closed is, we believe, valid." Accordingly, the court Orders that the Defendants in this matter shall be foreclosed from calling any expert witness at the trial upon the merits.

4.      Should the Defendants be precluded from challenging any of the Plaintiffs' expert witness opinions at trial?

The court denies this request. Although the Defendants are foreclosed from presenting their own expert witness, in this court's view, it does not follow that they are therefore foreclosed from cross examination of the Plaintiffs' expert witness. It must be remembered that the court, as fact finder, is free to accept or reject the testimony of any witness including an expert witness. In Thompson v Johnson, (270 A.2d 879, Me 1970), the Law Court wrote, "Even if the testimony of

5

the witness is not directly contradicted, it does not make it conclusive and binding upon the trier of facts. The rule is applicable to expert witnesses testimony. The above Rule is not without qualifications, however. …uncontradicted testimony is not to be utterly disregarded and arbitrarily ignored without reason."(internal citations and some punctuation omitted). More recently, in Handrahan v Maleno (2011 ME 15, 12 A.3d 790, the Law Court wrote, "A court is not required to believe the testimony of any particular witness, expert or otherwise, even when the witness' testimony is uncontradicted." (internal citations and punctuation omitted) Accordingly, if the Plaintiffs present a witness and if the court is satisfied that he qualifies as an expert witness, the Defendants may cross examine that witness in the usual manner.

> 5. Should the Defendants be precluded from introducing *direct testimony* through the use of a "learned treatise"?

The utilization of "learned treatises" is governed by Maine Rule of Evidence 803.18 that permits the introduction of a *statement* contained in a treatise, periodical, or pamphlet, if:

(A) The *statement* is called to the attention of an expert witness on *cross-examination*; and

(B) the publication is established as a reliable authority by the expert's admission or testimony, by another expert's testimony, or by judicial notice.

If admitted, the *statement* may be read into evidence but not received as an exhibit.

The Plaintiff seeks an Order prohibiting the utilization of a learned treatise as "direct testimony". The court interprets this request to mean utilizing a learned treatise as direct evidence during the Defendant's presentation of their case in chief. The Defendants bear the burden of establishing that whatever publication they contend is a "learned treatise" meets the

6

requisite standards. The rule restricts the use of learned treatises to use during *cross examination* (emphasis supplied) of an opposing expert witness. Should the Defendants seek to introduce "learned treatise" evidence outside of cross examination, it will be subject to objection on the basis of the Hearsay Rules.

The court has also italicized *"statement"* to draw attention to the limitations of even permitted uses of "learned treatise" evidence. Assuming, without finding, that the Defendants present a "learned treatise" during trial, the court would not anticipate receiving an entire volume of unknown length into evidence to pour over during its deliberations in search of *statements* contained therein that might support the proponent's positions. As this court interprets the rule, after a publication has been accepted as a "learned treatise", the proponent would then draw the witness' attention to particular and specific *statements* within the treatise to determine if the witness accepts or rejects them. Accordingly, the court grants this request regarding the use of a "learned treatise" as direct evidence outside of cross examination.

6.      Should the Defendants be precluded from introducing evidence in support of their counterclaim for defamation?

and

7.      Should the Defendants be precluded from introducing evidence in support of their counterclaim for the intentional infliction of emotional distress?

The court denies both of these requests. The Plaintiffs in effect argue that the Defendants' counterclaims cannot be proven for various reasons. What the Defendants can or cannot prove in support of their counterclaims remains to be seen. If they fail to prove the required legal elements of their cases then the Plaintiffs may make their argument at that time and the court will consider any such argument. However, the court is disinclined to foreclose the Defendants' opportunity to present their claims for consideration. Those claims may proceed to trial. The

court will then consider the evidence and the relevant legal requirements and render its judgment.

The entry shall be: The Plaintiffs' Motion *in Limine* is granted in part and denied in part.

October 18, 2019

E. Allen Hunter, Justice of the Superior Court
(Active Retired)

8